978 F.2d 1256
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of AMERICA, Plaintiff-Appellee,
v.
Terenzio AL-CANTARA, Defendant-Appellant.
 No. 91-5717.
 United States Court of Appeals,
Fourth Circuit.
 Argued: June 18, 1992
Decided: November 2, 1992
 
 Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Claude M. Hilton, District Judge. (CR-91-228-A)
 ARGUED: Edward Joseph Walinsky, Law Offices of Edward J. Walinsky, Falls Church, Virginia, for Appellant.
 David Glenn Barger, Assistant United States Attorney, Alexandria, Virginia, for Appellee.
 ON BRIEF: Melanie C. Eyre, Law Offices of Edward J. Walinsky, Falls Church, Virginia, for Appellant.
 Richard Cullen, United States Attorney, John M. Hodgens, Jr., Special Assistant United States Attorney, Alexandria, Virginia, for Appellee.
 E.D.Va.
 Affirmed.
 Before RUSSELL, WIDENER, and HALL, Circuit Judges.
 PER CURIAM:
 
 OPINION
 
 1
 The defendant, Terenzio Al-Cantara, appeals his conviction and sentence for two counts of knowing transportation of fraudulently obtained credit cards under 15 U.S.C. § 1644(b). The defendant contends that venue was improper, that the district court abused its discretion when it denied him motions for judgment of acquittal and for a new trial, that the district court abused its discretion in admitting certain evidence into trial, and that the district court erred in its factfindings relating to his sentencing under the Sentencing Guidelines. We affirm.
 
 
 2
 U.S. Customs Inspector Heather Olivier first made contact with the defendant, Al-Cantara, in Dulles International Airport upon his arrival from Frankfurt, West Germany on April 21, 1991. Inspector Olivier saw that the defendant had no luggage and appeared to be in a hurry. She approached him and asked several routine questions regarding his occupation, his point of origin, and his reason for making the trip. AlCantara explained that he had no occupation, that he had been to Germany to visit his girlfriend, and that he maintained two residences: one in Germany and one in the United States.
 
 
 3
 The examination of the defendant continued into the secondary search area. There the defendant was asked to open the small knapsack that he was carrying. Inspector Olivier examined the contents of the knapsack and discovered an international driver's license and compared it to the defendant's passport. Inspector Olivier noticed that the place of birth on the driver's license-Morocco-did not correspond to the place of birth on the U.S. Passport-Dominican Republic. She continued her search of the knapsack and discovered three credit cards. One credit card was in the name of Miss Elizabeth Goodbody; a second was in the name of Edmund Nogowski; and a third in the name of Stanley Loeb. Asked why he had the credit cards, the defendant told Inspector Olivier that the credit cards belonged to friends and that they had given him permission to use the cards. Further examination of the knapsack revealed a notebook, which contained sixteen (16) credit card numbers, names, and personal identifiers, including, but not limited to, telephone numbers, names of spouses, social security numbers, credit limits, addresses, account balances, and the expiration dates of the account numbers.
 
 
 4
 Later investigation revealed that between October 1990 and April 1991, over $21,000 of unauthorized charges were made on the nineteen credit cards and card numbers recovered from Al-Cantara. Among the sixteen (16) credit card numbers in the defendant's notebook were two credit card numbers that belonged to Miss Roberta Tross and one credit card number that belonged to Miss Michelle Schweitzer. Customs detained the defendant and called for the assistance of the United States Secret Service.
 
 
 5
 The Secret Service agents advised the defendant of his rights, and interviewed him. During the course of the questioning, the defendant admitted that the credit cards were stolen. The defendant also admitted that he had obtained the cards from a person in New York. Further, the defendant said that he wanted to work as an informant for American Express or AT & T and had previously met with employees of each organization. Shortly thereafter, the defendant was taken into custody by the Secret Service.
 
 
 6
 A few months prior to his arrest, Al-Cantara had come under Secret Service investigation. In December of 1990, James Lewer, an undercover special agent of the U.S. Secret Service, attended a meeting at the American Express security office in New York City. At that meeting, an individual who initially identified himself as "Edmund Nogowski," and later identified himself as Terenzio AlCantara, offered information to American Express in exchange for money. Al-Cantara displayed an AT & T credit card issued to Edmund Nogowski and explained that he was involved in a credit card fraud ring. The defendant said that shoppers, on behalf of the ring, would use fraudulently obtained cards to purchase merchandise. Thereafter, according to the defendant, the fraudulently obtained merchandise would be fenced, and the proceeds would be split among the group. The defendant also told Lewer and the American Express officials that he had initiated a mail drop scheme in order to obtain cards. The defendant said that he would take a stolen or otherwise fraudulently obtained card; and, after the card had been used to its full potential, he would call the credit card issuer; impersonate the true card holder; report the card as missing; request that a new card be issued; and request that the new card be mailed to a P.O. box or mail box that would have been previously set up. He also explained that he had opened a P.O. box by using a false identification. With that, the defendant produced two New York Department of Motor Vehicle interim driver's licenses and explained that he had contacts that could get licenses and other contacts that could supply the special print on the licenses. On the basis of what he had heard, Lewer decided to gather more evidence and also decided to maintain his cover as an American Express employee.
 
 
 7
 Also in December, 1990, Jack Post, of AT & T Card Services in Florida, received a telephone call from an individual who identified himself as "Edmund." "Edmund" explained that he had information that could help AT & T curtail some of its credit card losses in New York and that he wanted $30,000 in exchange for this information. Jack Post, thereafter, arranged a meeting between"Edmund" and Raymond Connolly, AT & T's security man in New York. In December 1990, "Edmund" met Connolly and later identified himself as Terenzio G. Al-Cantara, of 260 West 136th Street, New York, New York. The defendant showed Connolly an American Express card in the name of Stanley Loeb and told Connolly that he had the AT & T card number of Edmund Nogowski. Jack Post, thereafter, obtained the Nogowski card number and directed the same to be" blocked." The blocking prevents credit card approval, generally where the purchase exceeds $50.00. However, the card, if the purchase is below $50.00, generally, is still "live." Connolly sought additional information from the defendant, but, after several phone calls and a missed meeting, neither Connolly nor Post had heard back from the defendant.
 
 
 8
 Meanwhile, in December 1990, Edmund Nogowski, of Pittsburgh, Pennsylvania, received a telephone call from a representative of AT & T. The AT & T representative informed Mr. Nogowski that he had exceeded his credit limit. Nogowski, however, had not used the card. Further, on or about January 1991, the American Express monthly statements of Miss Roberta L. Tross were mysteriously being sent to 260 W. 138th Street, New York, New York, a location in which she had never worked or lived. Similarly, her Chemical Bank Mastercard statements were also being misdirected to 260 W. 138th Street, in care of "M. Schweitzer." Miss Michelle Schweitzer also ran into the same problem. Miss Schweitzer's Citibank Visa statements were being sent to 260 W. 138th Street in care of"R. Scott." Miss Schweitzer neither lived nor worked at that location. She also did not know "R. Scott."
 
 
 9
 Miss Nedra Jones, The U.S. Mail carrier assigned to the W. 138th Street route, testified at trial that the 260 W. 138th Street address "just doesn't exist." Miss Jones testified that she had returned to sender the mail she received for that address. She further testified that in or about December of 1990, a short, thin, light skinned, black male inquired at the post office about not receiving his mail at 260 W. 138th Street. Miss Jones told the man that no such address existed. The man responded that he had just moved to that address and that the landlord told him that was his address. Miss Jones thereafter held the mail in the Inquiry section for the man to pick up, rather than send it back to the sender. Miss Jones could not make a positive identification that Al-Cantara was the person who came into the office, but she did describe the person as having the same characteristics as the defendant. The evidence also showed that the defendant resided at 260 W. 136th Street with Robin Scott, exactly two blocks below the phantom address.
 
 
 10
 Among the two unauthorized charges on Miss Schweitzer's account number were two charges at Gianni Versace, a clothing boutique in New York City. These charges were made in December of 1990 in the name of Nicholas T. Vesti. Miss Schweitzer did not purchase the items and knew no Nicholas Vesti. The Government's handwriting expert, James E. Winand, compared the Gianni Versace receipts with the known handwriting exemplars of the defendant and testified that he was virtually certain that the defendant executed the Nicholas T. Vesti signature of the receipts.
 
 
 11
 On April 23, 1991, the day of the Al-Cantara's preliminary hearing and two days after he was arrested, Jack Post, of AT & T, received another telephone call from an individual who identified himself as "Edmund." The caller told Post that he called in order "to get our stories straight." Al-Cantara subsequently admitted, under crossexamination at trial, that he had, in fact, made the call to Post, but he denied the substance of the conversation.
 
 
 12
 Al-Cantara was indicted on a four-count indictment that charged him with violations of 15 U.S.C. § 1644(b) and 18 U.S.C. § 1029(a)(3). He was charged with three counts ofs 1644(b), one count for each of the three plastic cards he possessed, and one count of 18 U.S.C. § 1029(a)(3) for possessing the notebook that contained the sixteen (16) "access devices."[1]
 
 
 13
 Nineteen stipulations were filed with the district court and entered into evidence. The defendant stipulated that: (1) each of the account numbers belonged to another; (2) the defendant was not authorized to use or possess the account numbers; (3) the amount of the unauthorized charges or account numbers; (4) the dates of the unauthorized charges.
 
 
 14
 After a one-day trial, the jury found Al-Cantara guilty of two counts of § 1644(b) for the knowing transportation of the Nogowski and Goodbody credit cards. He was acquitted of the third § 1644(b) count as to the Loeb card. The fourth count unders 1029(a)(3) was dismissed by the district court because the access numbers in the indictment were not greater than fifteen, as required by that statute. Al-Cantara was sentenced under the Sentencing Guidelines for eighteen (18) months' imprisonment on each of the counts of conviction, to run concurrently.
 
 
 15
 Al-Cantara's first argument is that the district court abused its discretion when it refused to transfer venue to the Southern District of New York. Neither statute that Al-Cantara was convicted under has a specific venue provision, so we look to the relevant parts of the general venue statute for guidance:
 
 
 16
 (a) Except as otherwise provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.
 
 
 17
 Any offense involving the use of the mails, transportation in interstate or foreign commerce, or the importation of an object or person into the United States is a continuing offense and, except as otherwise expressly provided by enactment of Congress, may be inquired of and prosecuted in any district from, through, or into which such commerce, mail matter, or imported object or person moves.
 
 
 18
 18 U.S.C. § 3237(a) (emphasis added). In this case, Al-Cantara was indicted under 15 U.S.C. § 1644(b) and 18 U.S.C. § 1029(a)(3).[2] Section 1644(b) reads, in relevant part:
 
 
 19
 Whoever, with unlawful or fraudulent intent, transports ... in interstate ... commerce ... a fraudulently obtained credit card knowing the same to be ... fraudulently obtained; ...
 
 
 20
 Section 1029(a)(3) reads, in relevant part:
 
 
 21
 [Whoever] knowingly and with intent to defraud possesses fifteen or more devices which are counterfeit or unauthorized access devices; ... shall, if the offense affects interstate commerce ... be punished as provided in subsection (c) of this section.
 
 
 22
 Clearly, the operative verbs in both § 1644(b) and § 1029(a)(3), read with 18 U.S.C. 3237(a), describe Al-Cantara's conduct as continuing offenses in interstate commerce. His conduct took place in multiple districts, including the Eastern District of Virginia. Al-Cantara does not dispute he "transported" the credit cards to Dulles Airport and "possessed" them at Dulles Airport, within the Eastern District of Virginia. It is hard to see how the district court could have abused its discretion in retaining venue in the Eastern District of Virginia under § 3237(a), and we hold that it did not.
 
 
 23
 Al-Cantara's second argument is that the district court erred in refusing his post-conviction motions for a judgment of acquittal and a new trial. He asserts that the evidence was insufficient to convict him on counts two and three for the Nogowski and Goodbody credit cards. The defendant appears to misconstrue the Government's burden in this case. The Government need only have proved five elements to this crime, one of which did not include proving Al-Cantara actually defrauded someone. 15 U.S.C. § 1644(b). Of the five elements, Al-Cantara stipulated to or admitted to four of them: (1) that the cards were fraudulently obtained; (2) that he had knowledge that they were fraudulently obtained; (3) that they were possessed by him; and (4) that they were transported in interstate commerce or foreign commerce. The only true element in issue at trial was whether AlCantara had an "unlawful or fraudulent intent."
 
 
 24
 A rational jury, taking the facts in a light most favorable to the Government, could find fraudulent or unlawful intent in this case. The evidence was abundant. The Government had a string of witnesses, from a handwriting expert connecting Al-Cantara to the fraudulent use of the cards to an eyewitness connecting him to a fraudulent address. Moreover, there was ample evidence that Al-Cantara was connected with a large credit card fraud ring. All of this evidence pointed to Al-Cantara's voluntary and intentional participation in credit card fraud. Upon a review of the complete record, we are of opinion that the evidence was sufficient to find an unlawful or fraudulent intent on the part of the defendant. A rational jury could and did convict Al-Cantara on counts two and three of the indictment, and we find no error on the part of the district court in its refusal of a motion for a judgment of acquittal or to set aside the verdict.
 
 
 25
 Next, Al-Cantara argues the district court abused its discretion when it allowed evidence into his trial of fraudulent purchases made with some of the access devices in his possession. Al-Cantara argues that the jury should not have been allowed to see this evidence because the purchases were not connected to the cards he was actually convicted of possessing. He claims that their admission instead went to his character, in violation of Federal Rules of Evidence 403 and 404(b).
 
 
 26
 We find no merit to this argument. The district court has wide discretion on evidentiary rulings, and "this court will defer to the trial court's Rule 404(b) balancing unless it is an arbitrary or irrational exercise of discretion." United States v. Greenwood, 796 F.2d 49, 53 (4th Cir. 1986); see also Garraghty v. Jordan, 830 F.2d 1295, 1298 (4th Cir. 1987) (same standard used for both Rule 403 and 404(b) rulings).
 
 
 27
 Evidence of Al-Cantara's fraudulent purchases with access devices in his possession went directly to fraudulent intent, the principal element the government had the burden of proving in this case. The fact that fraudulent intent was an important element made this evidence admissible. Rule 404(b) specifically allows evidence of "other crimes, wrongs, or acts" when it is relevant to prove the defendant's intent, rather than character. The district court made the appropriate balancing test, and, finding no undue prejudice under Rule 403, admitted the evidence. We are of opinion it did not err.
 
 
 28
 Defendant further argues the district court abused its discretion when it allowed Miss Nedra Jones to testify at trial. Al-Cantara argues that this testimony was "highly prejudicial" and should not have been allowed in under Federal Rules of Evidence 402 and 403 because the witness testified to Al-Cantara's fraudulent activity but could not positively identify him.
 
 
 29
 Miss Jones was the mail carrier on the route in question for over eight months. She testified that a person resembling Al-Cantara asked about a false address that the Government later connected to the fraud.[3] Her testimony was reliable upon this issue as well as what she saw and experienced in the performance of her duties.
 
 
 30
 The Government's burden was to prove fraudulent intent, and Miss Jones' testimony went directly to that issue. As the district court stated, "[i]t goes right to the heart of the Government's case." Her testimony was reliable, relevant, and without undue prejudice. We are of opinion that the district court did not err when it allowed her testimony.
 
 
 31
 Defendant's final argument is that the district court erred in the determination of his sentence. Specifically, Al-Cantara argues that the 4-level upward adjustment for the dollar amount of loss for fraud was miscalculated and that the 2-level enhancement for finding an obstruction of justice was in error. In this case, we are of opinion that district court's calculation of the fraudulent loss amount was primarily a question of fact reviewable under a clearly erroneous standard. See United States v. Hicks, 948 F.2d 877, 881 (4th Cir. 1991). Whether Al-Cantara obstructed justice by "unlawfully influencing a witness" is also primarily a question of fact reviewable under a clearly erroneous standard. See United States v. Franco-Torres, 869 F.2d 797, 800 (5th Cir. 1989) (obstruction of justice finding "enjoys the protection of the clearly erroneous standard."). We think that in neither of these findings was the district court clearly erroneous.
 
 
 32
 Accordingly, the convictions and sentence are
 
 
 33
 AFFIRMED.
 
 
 
 [1]
 "[T]he term 'access device' means any card, plate, code, account number, or other means of access that can be used ... to obtain money, goods, services, or any thing of value." 18 U.S.C. § 1029(e)(1)
 
 
 [2]
 Though the defendant was convicted only under counts two and three pursuant to 15 U.S.C. § 1644(b). The district judge dismissed count four under Rule 29(a) of the Federal Rules of Criminal Procedure
 
 
 [3]
 The letter carrier testified to the false address at 260 W. 138th Street, the same address that the evidence showed was the intended destination for Miss Schweitzer's billing statement. The defendant stipulated to the possession of Miss Schweitzer's access device